# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTHONY ALLEGRINO, as       )
assignee of Liberty Immobiliare, Inc.,       )
      )
      Plaintiff,       )
      )
      v.       )       Civil Action No. 09-1507
      )       Judge Nora Barry Fischer
CONWAY E & S, INC., et al,       )
      )
      Defendants.       )

## MEMORANDUM OPINION

## I. Introduction

In this Memorandum Opinion, the Court will address the parties' dispute regarding whether losses to *pro se* Plaintiff Anthony Allegrino's[1] ("Plaintiff") telecommunications and computer equipment ("electronic equipment")[2] are covered under the insurance policies his business, Liberty Immobilaire, Inc., purchased from Defendants Certain Underwriters at Lloyd's, Advent Underwriting Limited, a/k/a Lloyd's Syndicate 780, and Omega Underwriting Agents Ltd., a/k/a Lloyd's Syndicate 958 (collectively, "Underwriters"). Underwriters initially moved to dismiss Plaintiff's breach of contract claims against them to the extent that Plaintiff has alleged that said equipment is covered

---

[1] Plaintiff, Anthony Allegrino, is a domiciliary of the state of California and a resident of the state of New York (Docket No. 3 at ¶ 7). Plaintiff has previously been admitted to the practice of law in the state of California on June 1, 1999; however, on November 9, 2007, the California Supreme Court disbarred the Plaintiff from the practice of law. *Allegrino v. Conway E & S Servs.,* Civ. A. No. 09-1507, 2010 WL 168775, at *1 at n.1 (W.D.Pa. April 26, 2010)(internal quotations omitted).

[2]

      The parties refer to this property as "business personal property" throughout their pleadings. Because "business personal property" is a specifically defined term in the Policies, giving that term legal effect in the context of the instant dispute, the Court will use the more general term "electronic equipment" when referring to said property.

by the policies but later requested that the Court consider matters outside the pleadings and convert their motion to one for partial summary judgment.[3] *Transcript of Motion Hearing, 7/29/10 ("Hr'g Trans 7/29/10")* at 5. Both parties have presented evidence outside the pleadings for the Court's consideration, including the examination under oath of Plaintiff. (Docket Nos. 210, 219, 222, 223). Therefore, having considered these additional matters, the Court will convert Underwriters' motion to one for partial summary judgment.[4] Upon consideration of the parties' submissions, and for the following reasons, the Court finds that the subject policies cover only losses to Plaintiff's real property. Hence, Underwriters' motion for partial summary judgment is granted.[5]

## II. Relevant Factual Background

### A. *The Property and the Purchase of the Insurance Policies*[6]

Plaintiff[7] owns real property and a building at 138 Aurilles Street, Duquesne, Pennsylvania. The property was covered under an insurance policy issued by Underwriters, Policy Number CONW-

---

[3]

In the present motion, Underwriters does not challenge Plaintiff's breach of contract claims to the extent he requests coverage for losses to the real property.

[4]

*See* section IV, *infra*.

[5]

To the extent that Underwriters' motion requests that paragraphs 73-77 and Claim # 9 of the Third Amended Complaint be stricken, said motion is denied, as moot, the Court having entered an order striking those paragraphs and dismissing said claim on August 12, 2010. (Docket No. 226).

[6]

The parties to the instant motion are well aware of the factual allegations in Plaintiff's Third Amended Complaint. Thus, the Court will not recite the entirety of his allegations here. A full recitation of Plaintiff's allegations are available in the Court's prior Memorandum Opinions. (*See* Docket Nos. 224, 227).

[7]

The owner of the subject rental investment property, a multi-unit apartment building, is Liberty Immobiliare, Inc. Plaintiff is the primary stockholder and president of Liberty Immobiliare, Inc.

51534-07, which provided insurance from May 9, 2007 to May 9, 2008.[8] (Docket No. 177-1, Exhibit "A"). The property was then covered under a second policy issued by Underwriters, Policy Number CONW-51636-08, which provided insurance from May 9, 2008 to May 9, 2009. (Docket No. 177-2, Exhibit "B").

The Policies generally contain the same terms and conditions, unless otherwise noted. The Declaration Pages provide that: "This Declaration Page is attached to and forms part of the policy provisions." (Docket No. 187-1 at 2; 187-2 at 2). The Declaration Pages state that coverage is provided for "Real Property," described as a "2 story joisted masonry/vacant building" at 138 Aurilles Street, Duquesne, Pennsylvania.[9] (Docket No. 187-1 at 2; 187-2 at 2). The "Amount" of coverage for the property was $80,000 in 2007-2008, which was later increased to $160,000 in 2008-2009.[10] (Id.). Further, the Declarations indicate that Plaintiff purchased "Basic" coverage. (Id.).

The specific terms and conditions regarding the coverage provided are as follows:

A.    COVERAGE
We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
1.    Covered Property
Covered Property as used in this Coverage Part, means the type of property described in this section, A.1., and limited in

---

[8]

Liberty is the policyholder, but on November 10, 2009, Plaintiff took by assignment from Liberty any and all outstanding and unresolved claims made on the policies. (Docket No. 177 at ¶¶ 7, 8, 25).

[9]

The policies cover additional insured premises; however, the coverage of building #1, the 138 Aurilles Street property, is the only coverage at issue in this case. Thus, the Court will limit its discussion to that property.

[10]

The Court notes that the version of the '07-08 Policy attached to Plaintiff's Third Amended Complaint contains handwriting purporting to cross out $80,000 of coverage and increase the limit to $160,000. (Docket No. 177-1). Underwriters objects and argues that the handwritten changes are not effective. (Docket No. 188). This dispute is not relevant to the disposition of the instant motion because only the existence of coverage is contested, not the amount of that coverage.

A.2., Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

a.      Building, meaning the building or structure described in the Declarations, including:

    (1)    Completed additions;

    (2)    Fixtures, including outdoor fixtures;

    (3)    Permanently installed:

        (a)    Machinery and

        (b)    Equipment;

    (4)    Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

        (a)    Fire extinguishing equipment;

        (b)    Outdoor furniture;

        (c)    Floor coverings;

        (d)    Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

    (5)    If not covered by other insurance:

        (a)    Additions under construction, alterations and repairs to the building or structure;

        (b)    Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, use for making additions, alterations or repairs to the building or structure.

b.      Your Business Personal Property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property - Separation of Coverage Form.

    (1)    Furniture and fixtures;

    (2)    Machinery and equipment;

    (3)    "Stock";

    (4)    All other personal property owned by you and used in your business;

    (5)    Labor, materials or services furnished or arranged by you on personal property of others;

    (6)    Your use interest as tenant in improvements and betterments are fixtures, alterations, installations or additions:

        (a)      Made a part of the building or structure you occupy but do not own; and

        (b)      You acquired or made at your expense but cannot legally remove;

    (7)     Leased personal property for which you have a contractual responsibility to Insure, unless otherwise provided for under Personal Property of Others.

(Docket Nos. 187-1 at 20; 187-2 at 20). The amount of coverage was limited in the Policies, which specifically state that:

    C.      LIMITS OF INSURANCE
            The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

(Docket Nos. 187-1 at 21; 187-2 at 21). As noted, the Policies provide coverage for "Basic" causes of loss. (Docket No. 187-1 at 2; 187-2 at 2). In pertinent part, those sections of the Policies state that:

    A.      COVERED CAUSES OF LOSS
            When Basic is shown in the Declarations, Covered Causes of Loss means the following:
                 ...

        4.      Windstorm or Hail, but not including:
           a.      Frost or cold weather;
           b.      Ice (other than hail), snow or sleet, whether driven by wind or not; or
           c.      Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters.

                 ...

8. Vandalism, meaning willful and malicious damage to, or destruction of, the described property.
We will not pay for loss or damage:
   a. To glass (other than glass building blocks) that is part of a building, structure, or an outside sign; but we will pay for loss or damage to other property caused by or resulting from breakage of glass by vandals.
   b. Caused by or resulting from theft, except for building damage caused by the breaking and exiting of burglars.

(Docket Nos. 187-1 at 27; 187-2 at 27).

The Policies contain a number of exclusions, including exclusions for recovery of certain losses due to vacancy of the covered premises. (Docket No. 187-1 at 23; 187-2 at 23). Those provisions provide as follows:

b. Vacancy Provisions
If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:
   (1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:
      (a) Vandalism;
      (B) Sprinkler leakage, unless you have protected the system against freezing;
      (c) Building glass breakage;
      (d) Water damage;
      (e) Theft; or
      (f) Attempted theft.
   (2) With respect to Covered Causes of Loss other than those listed in b.(1)(a) through b.(1)(f) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

(*Id*.). Plaintiff was also issued vacancy permits for both periods because the building was under construction and no one was onsite on a regular basis. (Docket No. 177 at ¶ 32). The Vacancy

6

Permits generally provide that:

> A. The VACANCY Loss Condition does not apply to direct physical loss or damage:
> 1. At the locations; and
> 2. During the Permit Period:
> shown in the Schedule or in the Declarations.
>
> B. This Vacancy Permit does not apply to the Excepted Causes of Loss indicated in the Declarations or by an "X" in the Schedule.

(Docket No. 187-1 at 31; 187-2 at 31).

B.  *Plaintiff's Claims Against Defendants*

Plaintiff has set forth six breach of contract claims against Underwriters in his Third Amended Complaint.  (*See* Docket No. 177).  In these claims, he seeks damages from Underwriters for their failure to pay his insurance claims from the alleged losses sustained to his electronic equipment and real property.  His claims are summarized as follows:

> Claim 1.  A claim arising under the '07-08 Policy for losses to business personal property (electronic equipment) and real property sustained by alleged vandalism between November 7, 2007 and April 10, 2008;
>
> Claim 2.  A claim arising under the '08-09 Policy for losses to business personal property (electronic equipment) and real property sustained by alleged vandalism between May 23, 2008 and August 18, 2008;
>
> Claim 3.  A claim arising under the '08-09 Policy for losses sustained as a result of the damaged business personal property (electronic equipment) being discarded after it was moved to New York;
>
> Claim 4:  A claim arising under the '08-09 Policy for losses to business personal property (electronic equipment) and real property sustained as a result of the alleged windstorm damage which occurred on July 20, 2008;

Claim 5: A claim arising under the '08-09 Policy for losses to business personal property (electronic equipment) and real property sustained as a result of the alleged windstorm damage which occurred on July 22, 2008; and,

Claim 6: A claim arising under the '08-09 Policy for losses to business personal property (electronic equipment) and real property sustained as a result of the alleged negligent demolition of an adjacent building between May 23, 2008.

(Docket No. 177 at ¶¶ 78-136).

C. *Description of Plaintiff's Electronic Equipment*

The parties have submitted evidence describing the electronic equipment which Plaintiff contends was damaged and covered under the Policies.

1. October 12, 2008 Letter to RTI

On October 12, 2008, Plaintiff wrote a letter to RTI[11] which details the electronic equipment that was present in the basement of 138 Aurilles Street. (Docket No. 223 at 7). His letter indicates that the following items were installed in the basement: two Cisco servers, and a Merlin Telephone System. (*Id*.). The letter further states that the following property was stored in the basement: a Sony laptop; "Cell Phones, Nokia N95, Blackberry, Broadband Unit"; Pelco Surveillance Equipment; 16 Channel Duplex Multiplexer; 21" Color Monitor; 14" Color Monitor; "Telephone Equipment, Avaya"; and "Servers, Indyme." (*Id*.). His letter did not describe what he meant by "installed," but Plaintiff states that he was removing the electronic equipment from Aurilles Street to 378 Broadway, Newburgh, New York, in order to protect it from further damage. (*Id*.).

---

[11] There is no evidence that this letter was forwarded to Underwriters.

Plaintiff argues in his supplemental brief that the Cisco Routers and Merlin Legend Telephone System were "permanently installed" in the Aurilles Street property prior to their removal.[12] (Docket No. 223 at 3). He maintains that this equipment "was affixed to concrete by metal brackets and bolts" and that it provided internet, computer or telephone service to the building. (*Id*.). He later removed the equipment from the building, and the removal caused the wall of the building to be partially destroyed. (*Id*.). He claims that the value of this property was approximately $181,100. (*Id*.).

## 2. May 11, 2009 Examination Under Oath

As part of the investigation of Plaintiff's insurance claims, Plaintiff was subject to an examination under oath[13] during which he answered questions regarding his insurance claims. (Docket No. 222-1). This sworn examination took place on May 11, 2009. (*Id*. at 1). Plaintiff explained that he had various pieces of commercial telecommunications equipment in the Aurilles Street property, including routers, AT&T "stuff", Merlin, and Cisco equipment. (*Id*. at 27, p. 106-107). He had the equipment for use in his "search engine" business. (*Id*.). He was storing this equipment in the basement and he intended to install it in either the Aurilles Street property or a property that he owned on Woodmont Avenue. (*Id*. at 27, p. 106, 48 at p. 191-92). Some of the electronic equipment was stored in the basement since the Summer of 2007 and other property was

---

12

 This information is not in a sworn affidavit. Moreover, it was submitted on July 15, 2010, almost two years after the letter described above was drafted. *See* discussion at p. 8, *supra*.

13

 The instant Policies provide that Underwriters may require an examination under oath of Plaintiff during its investigation of his claims. Specifically, the Policies state that Underwriters "may examine any insured under oath ... about any matter relating to this insurance or the claim, including an insured's books and records." (Docket No. 187-1 at 22; 187-2 at 22). Underwriters invoked this provision in the present case. The purpose of an examination under oath is to permit the insurer to obtain additional information from the insured to enable it "to determine whether the claim is a just one which should be paid." 13 COUCH ON INS. § 196:3 (2010).

stored there in May 2008. (*Id*. at 31, p. 124). After the equipment was damaged, Plaintiff removed it from the Aurilles Street property and moved it to Newburgh, New York. (*Id*. at 48, p. 189). He stored the equipment at a pizzeria in Newburgh and the equipment was unintentionally discarded by one of its workers. (*Id*.).

### 3. July 2010 Affidavit

In his affidavit, Plaintiff states that "[t]he majority of the business property claims were computer systems and multiline automated telephone systems which were permanent fixtures (not moveable and attached to the building) at the property at the time of the loss." (Docket No. 210-1 at ¶ 8). He asserts that Byron Pryor of RTI advised him that his electronic equipment was not covered under the Policies because the property was vacant. (*Id*. at ¶ 4, p. 5). However, Plaintiff points out that he purchased a vacancy permit along with his Policies and that the vacancy permit negated the effect of the Policies' exclusion of coverage for business personal property due to vacancy. (*Id*. at ¶ 5). He also maintains that certain provisions of the Policies expressly permitted the property to be vacant during construction. (*Id*. at ¶ 6).

## III. Relevant Procedural History

Plaintiff filed his Third Amended Complaint on June 11, 2010. (Docket No. 177). Underwriters filed the pending motion to dismiss/motion to strike and brief in support on June 25, 2010.[14] (Docket Nos. 187, 188). Plaintiff did not initially file a response to said motion. He later sought leave to file an untimely response, which was granted by the Court. (Docket Nos. 205, 206). Underwriters filed a reply brief on July 8, 2010. (Docket No. 207). Plaintiff then filed a "sur-reply"

---

[14] Defendants also filed a companion motion for sanctions against Plaintiff. (Docket Nos. 188, 189). That motion was denied. (Docket No. 226).

brief and affidavit in response on July 15, 2010. (Docket No. 210). After receiving leave of Court, Underwriters filed a "sur sur-reply" brief on July 26, 2010, attaching an excerpt of the aforementioned examination under oath in further support of their motion. (Docket No. 219).

A motion hearing was then held on July 29, 2010 and the transcript was ordered.[15] (Docket No. 221). At the hearing, the Court also ordered Underwriters to submit the complete transcript of the examination under oath and granted Plaintiff leave to file any further briefing or other materials in opposition to the motion. (Docket No. 221). Underwriters filed the complete transcript on August 2, 2010. (Docket No. 222). Plaintiff responded by filing his supplemental brief and further evidence on August 10, 2010. (Docket No. 223). The briefing and submission of evidence has since concluded and Underwriters' motion is ripe for disposition given the Court's review of the transcripts of the examination under oath and of the hearing.

IV.    **Legal Standard**

As noted, Underwriters' motion was initially filed as a motion to dismiss under Rule 12(b)(6) but its counsel later advocated that the motion be converted to a motion for partial summary judgment. (Docket Nos. 187, 188); *Trans Hr'g 7/29/10* at 5. The Court recognized the request for conversion and gave the parties the opportunity to supplement the record after notice was provided of the possible conversion. (Docket No. 221). The parties have submitted matters outside the pleadings including affidavits, a transcript of a sworn examination of Plaintiff, and other documentary evidence, which the Court has considered. (Docket Nos. 210, 219, 222, 223). Thus, the present motion will be converted to a motion for partial summary judgment under Rule 12(d) of

---

[15]

The transcript was received by the Court on September 16, 2010.

the Federal Rules of Civil Procedure. *See, e.g.*, FED.R.CIV.P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."); *Renchenksi v. Williams et al.*, --- F.3d ----, 2010 WL 3835217, at *19 (3d Cir. 2010)(noting the requirements for conversion of a motion to dismiss to a motion for summary judgment in a *pro se* prisoner case); *Rose v. Bartle*, 871 F.2d 331, 342 (3d Cir. 1989)(holding that "it would be desirable in the interest of clarity for an order to expressly notify the parties that the court was converting a motion to dismiss into one for summary judgment or that the ruling would be pursuant to Rule 56, the court need not be so explicit so long as the order otherwise fairly apprises the parties of the proposed conversion").

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV. P. 56(c). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As to materiality, "only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

In determining whether the dispute is genuine, the court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. The court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994)). In evaluating the evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

## V.     Discussion

Under Pennsylvania law:[16]

> [t]he task of interpreting [an insurance] contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.

*Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 435 (3d Cir. 2006) (quoting *Gene & Harvey Builders v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 512 Pa. 420, 517 A.2d 910, 913 (Pa. 1986)

---

[16]

In their filings, the parties have both cited Pennsylvania law in support of their respective positions in the instant contractual dispute. Thus, they implicitly agree that Pennsylvania law is properly applied. "[B]ased on the parties' implicit agreement to follow Pennsylvania law and the state of Pennsylvania's interest in this action, the Court sees no reason to *sua sponte* engage in a choice-of-law analysis." *Kraus Industries, Inc. v. Moore*, Civ. A. No. 06-542, 2007 WL 2744194, at *4 (W.D. Pa. Sept. 18, 2007).

(quoting *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563, 566 (Pa. 1983))).

"Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Prudential Property and Cas. Ins. Co. v. Sartno*, 588 Pa. 205, 212, 903 A.2d 1170, 1174 (Pa. 2006) (quoting *Hutchison v. Sunbeam Coal Co. [Corp.]*, 513 Pa. 192, 201, 519 A.2d 385, 390 (1986)). "This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Prudential*, 588 Pa. at 212 (citing *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (1999)). "Where critical terms are left undefined in a policy, Pennsylvania case law instructs that:

> [w]ords of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense, *Easton v. Washington County Ins. Co.*, 391 Pa. 28, 137 A.2d 332, 335 (1957); *Blue Anchor Overall Co. v. Pennsylvania Lumbermens Mut. Ins. Co.*, 385 Pa. 394, 123 A.2d 413, 415 (1956), and we may inform our understanding of these terms by considering their dictionary definitions."

*Canal Ins. Co.,* 435 F.3d at 435-36 (quoting *Madison Constr. Co.*, 735 A.2d at 108).

Finally, the insured bears the initial burden of showing that his claim is within the coverage provided by the policy. *Erie Ins. Exchange v. Transamerica Ins. Co.*, 516 Pa. 574, 533 A.2d 1363, 1366 (Pa. 1987). If this burden is met, the burden shifts to the insurer to demonstrate that an exception or exclusion applies. *Id*.

Plaintiff sets forth alternative arguments regarding the alleged coverage for his electronic equipment. (Docket Nos. 210, 223). First, he contends that his equipment is "business personal property" covered by Section A.1.b. of the Policies. (Docket No. 210). Second, he argues that his

14

equipment is covered by Section A.1.a. (2), (3) or (4) of the Policies because this property should

be considered a fixture, permanently installed machinery or equipment, or personal property used

to maintain or service the building. (Docket No. 223). Underwriters' position is that the policies

do not provide coverage for Plaintiff's electronic equipment. (Docket Nos. 188, 219). The Court

will address the parties' positions, in turn.

      A.     *"Business Personal Property"*

At the outset, the Court first rejects Plaintiff's reliance on the interpretation of the Policies

by his insurance broker, Byron Pryor of RTI.[17] Pryor allegedly explained to Plaintiff that "[t]here

is no coverage for Business Personal Property in your policy (due to the vacancy)." (Docket No.

210-1). As noted, the intent of the parties is determined from the language of the policies and not

from the interpretation offered by one of the parties or their agents. *See Canal Ins. Co.*, 435 F.3d at

435.

Turning to the Policies, the language is clear and unambiguous that the Policies provide

coverage only for real property under Section A.1.a. *See Canal Ins. Co.*, 435 F.3d at 435.

Specifically, the Policies state that "Covered Property ... means the type of property described in ...

[Section] A.1 ... if a Limit of Insurance is shown in the Declarations for that type of property."

(Docket Nos. 187-1 at 20; 187-2 at 20). The Declarations clearly state that coverage is provided for

"real property," described as a "2 story joisted masonry/vacant [building]" at 138 Aurilles Street and

that the limits of insurance for that real property was $80,000 under the '07-08 Policy and $160,000

---

[17]

        The Court has found in a prior Memorandum Opinion that Plaintiff alleged sufficient facts to state a plausible claim of negligence against RTI based on its alleged failure to procure insurance on Liberty's behalf as requested. (Docket No. 227). Thus, RTI's role in securing insurance on Liberty's behalf and RTI's interpretation of the Policies *may* be challenged in that claim.

under the '08-09 Policy.  (Docket No. 187-1 at 2; 187-2 at 2).  Nowhere in the Declarations is there

a limit of insurance for personal property.  (*Id*.).

Moreover, the term "real property" is a word of common usage and, thus, not ambiguous.

*See Canal Ins. Co.*, 435 F.3d at 435-36.  Real property is commonly defined as "[l]and and anything

growing on, attached to, or erected on it, excluding anything that may be severed without injury to

the land. • Real property can be either corporeal (soil and buildings) or incorporeal (easements)."

BLACK'S LAW DICTIONARY, "property" (8th ed. 2004).  In the context of the instant insurance

policies, the term real property is only susceptible of one meaning, that is, the building and land at

138 Aurilles Street.  Meanwhile, "personal property" is distinct.  Its common definition plainly

excludes "real property."  *See* BLACK'S, "property"*, supra* (defining "personal property" as "[a]ny

movable or intangible thing that is subject to ownership and not classified as real property.").

Thus, the Policies clearly and unambiguously show that Plaintiff did not purchase coverage

for "business personal property," as he suggests.  This is the only reasonable interpretation of the

Policies.  *See McDermott Inc. v. Records Storage & Services, Inc.*, 875 So.2d 863, 866 (La.App. 4

Cir. 2004)(interpreting a similar Lloyds' policy and concluding that personal property of others was

not covered by the insurance policy as that type of property was not listed on the declaration form).

Therefore, Plaintiff has failed to meet his burden to demonstrate that his electronic equipment is

covered under Section A.1.b. of the Policies.[18]  Because the electronic equipment is not covered

under that Section, Underwriters cannot be liable for breach of same.  Accordingly, as there are no

---

[18]

Given the Court's holding that Plaintiff did not meet his burden to demonstrate that his electronic equipment was covered as "business personal property," the Court need not address Plaintiff's interpretation of the cited "vacancy" exclusion and the effect of his vacancy permits because the vacancy exclusion need not be invoked by the insurer when there is no coverage.  *See Erie Ins. Exchange*, 533 A.2d at 1366.

genuine issues of material fact and Underwriters is entitled to judgment as a matter of law regarding Plaintiff's assertion of an alleged breach of Section A.1.b. of the Policies, Underwriters' motion for partial summary judgment is granted.

B.      *"Building"*

In this Court's estimation, Plaintiff's electronic equipment is also not covered under Section A.1.a. of the Policies because said equipment is not covered under the definition of "Building" set forth in that Section.  The parties do not dispute that the real property at 138 Aurilles Street is covered by the Policies.[19]  However, Plaintiff maintains that his electronic equipment, including the telecommunications and computer equipment, falls within the definition of "Building" in the Policies.  (Docket No. 223).  That definition is, in pertinent part, as follows:

> a.      Building, meaning the building or structure described in the Declarations, including:
> 
> ...
> 
> (2)      Fixtures, including outdoor fixtures;
> (3)      Permanently installed:
> > (a)      Machinery and
> > (b)      Equipment;
> (4)      Personal property owned by you that is used to maintain or service the building or structure or its premises, including:
> > (a)      Fire extinguishing equipment;
> > (b)      Outdoor furniture;
> > (c)      Floor coverings;
> > (d)      Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(Docket Nos. 187-1 at 20; 187-2 at 20).

Turning first to subsection a.2., the term "fixture" is not defined in the Policies.  (*See* Docket Nos. 187-1; 187-2).  However, giving the term its most common construction, a "fixture" is

---

[19]

*See* n. 3 & n. 9, *supra*.

"[p]ersonal property that is attached to land or a building and that is regarded as an irremovable part of the real property, such as a fireplace built into a home." BLACK'S, "fixture", *supra*. After the alleged damage to Plaintiff's electronic equipment, he states he removed it from the building and relocated it to New York. (Docket No. 223 at 3). Because it was taken out of the building, this property does not constitute "irremovable" property. Moreover, telecommunications and computer equipment which was only mounted on a wall is certainly not annexed to a building in the manner that a fireplace is annexed to a home. Given this definition, Plaintiff's telecommunications and computer equipment do not constitute "fixtures" and such property is not covered under subsection a.2. of the policies.

With respect to subsection a.3., the parties dispute whether the electronic equipment was "installed" in the building. During his sworn examination, Plaintiff explained that his electronic equipment was not yet installed, but that he intended to install it in either the Aurilles Street property or at a commercial building he owned on Woodlawn Avenue. (Docket No. 222-1 at 27, p. 106-07, and 48, p. 191-92). In a letter and his later submitted supplemental brief, Plaintiff maintains that two Cisco servers and a Merlin Telephone System were installed at the property. (Docket Nos. 223 at 3; Docket No. 210-1 at ¶ 8). However, this dispute is not material to the instant motion and does not preclude the Court from entering summary judgment against him. Even if the equipment was installed, it was not "permanently installed," and, thus, it is not covered under the Policies. *See Anderson*, 477 U.S. at 248 (holding that only factual disputes which would affect the outcome of the suit are "material").

The terms "permanent" and "installed" are not defined in the policies. (*See* Docket Nos. 187-1; 187-2). But, these are words of common usage that have general meanings. *See Canal Ins. Co.*,

435 F.3d at 435-36. The general definition of "permanent" is "continuing or enduring without fundamental or marked change." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed 2003) at 923. Further, to "install" a thing is "to set [it] up for use or service." MERRIAM-WEBSTER'S, *supra* at 648. Thus, the general definition of "permanently installed equipment" would be equipment that was set up for use or service for a continuing or enduring period of time. This definition is akin to the legal definition of a "permanent fixture," which is "irremovable" property attached to realty. BLACK'S, "fixture", *supra*. Again, given Plaintiff's admissions that the telecommunications and computer equipment were only mounted on a wall and that he removed this property from the building and relocated it to New York, the property was not "permanently installed." (Docket No. 223 at 3; Docket No. 177 at ¶¶ 102-104). Therefore, subsection a.3.b. does not provide coverage.

As to subsection a.4, electronic equipment is not one of the listed types of property that are specifically covered by that section. (*See* Docket Nos. 187-1 at 20, 187-2 at 20). That subsection lists only: fire extinguishing equipment; outdoor furniture; floor coverings; and "[a]ppliances used for refrigerating, ventilating, cooking, dishwashing or laundering." (*Id*.). Moreover, the electronic equipment is also not "personal property used to maintain or service the building." (*Id*.). The terms "maintain" and "service" are not defined in the policies. (Docket Nos. 187-1; 187-2). However, both terms have general meanings, which are applicable here. *See Canal Ins. Co.*, 435 F.3d at 435-36. "Maintain" means "[t]o care for (property) for purposes of operation productivity or appearance; to engage in general repair and upkeep." BLACK'S, "maintain", 4, *supra*; *see also* MERRIAM-WEBSTER'S, *supra* at 749 (defining "maintain" as "to keep in an existing state (as of repair, efficiency, or validity)"). "Service" has a similar definition, which is, "to provide service to; to repair or perform maintenance for." MERRIAM-WEBSTER'S, *supra* at 1137. Thus, the general

meaning of "personal property used to maintain or service the building" is personal property that is used to care for the building, continue the productivity of the building or to repair the building. The types of property specifically listed in subsection a.4 of the Policies (fire extinguishers, appliances, outdoor furniture and wall coverings) squarely fit within this definition. Plaintiff's equipment does not.

Plaintiff argues that his telephone and computer equipment provided "telephone and internet service" to the building. (Docket No. 223). However, he also testified that the equipment was intended to be used for business purposes, i.e., he intended to use it to operate his search engine business. (Docket No. 222-1 at 27, p. 106-07, at 52, p. 206). Because Plaintiff's electronic equipment was to be used for business purposes rather than used to service or maintain the building, his equipment is not covered by the Policies. *See, e.g., American Resources Ins. Co. v. Palmer,* Civ. A. No. 4:08-03314-RBH, 2010 WL 3282579, at *8 (D.S.C. Aug 19, 2010) (construing identical policy language and holding that "the Building coverage provision of the Policy covers personal property that is used to maintain or service the building as opposed to the furniture, fixtures, machinery, equipment, and other personal property owned and used in the business as contemplated by the Business Personal Property provision"); *Ormond County Club v. James River Ins. Co.*, Civ. A. No. 06-11376, 2008 WL 859482, at *3 (E.D.La. Mar. 27, 2008) (construing similar language and holding that swimming pool pumps did not constitute "personal property" used to service or maintain the building); 10A COUCH ON INS. § 148:13 (2010) ("'Personal property' in this sense means property used for the insured's 'personal purposes' rather than for 'business purposes.' Both types of this 'personal property' also fall within the category of 'personal property' used to distinguish real property."). Moreover, much of Plaintiff's equipment was never installed in the

building, therefore, the uninstalled property is clearly not covered under this section of the Policies. (*See* Docket No. 223 at 7). In sum, Plaintiff has failed to meet his burden to demonstrate that the Policies provide coverage for his electronic equipment under subsection a.4.

For these reasons, Plaintiff's electronic equipment is not covered under Section A.1.b of the Policies. Because the electronic equipment is not covered under this Section of the Policies, Underwriters cannot be liable for breach of same. Accordingly, as there are no genuine issues of material fact and it is clear that Underwriters is entitled to judgment as a matter of law regarding Plaintiff's assertion of an alleged breach of Section A.1.b of the Policies, Underwriters' motion for partial summary judgment is granted.

## VI. Conclusion

Based on the foregoing, Underwriters' motion to dismiss, now converted to a motion for partial summary judgment, [187] is granted. Summary judgment will be entered in favor of Underwriters and against Plaintiff as to Claim 3 of his Third Amended Complaint in its entirety and Claims 1, 2, 4, 5, and 6 of his Third Amended Complaint to the extent Plaintiff alleges breach of contract for failure to pay his insurance claims for losses to his electronic equipment. An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date: October 14, 2010.

cc/ecf: All counsel of record.
Anthony Allegrino, II, *pro se*